UNITED STATES of America

v.

Leonard J. CIACCIO et al.

Crim. Nos. 72–0307 to 72–0310, 72–0312 to 72–0315, 72–0342, 72–0343–Y.

United States District Court,
D. Maryland.

Nov. 9, 1972.

Charles Weintraub, Stanley Greenidge, Asst. U. S. Attys., Baltimore, Md., for plaintiff.

Frank Cahn, II, Marvin Garbis, Myer E. Grossfeld, David S. Harris, Baltimore, Md., for defendants.

## MEMORANDUM AND ORDER

JOSEPH H. YOUNG, District Judge.

On May 18, 1971, Special Investigator Robert Sanders, Alcohol, Tobacco and Firearms Division, Internal Revenue Service, applied for and obtained a warrant for inspection and examination of each of various defendant retail liquor dealers in the downtown Baltimore area known as "The Block". It has been stipulated that all applications are identical except for the first paragraph which states that in some cases an examination of the records of the Secretary of the Treasury has failed to reflect the issuance of the required Retail Liquor Dealer's Special Tax Stamp, while others revealed the necessary stamps.

Pursuant to the warrant, agents of the Alcohol, Tobacco and Firearms Division of the Internal Revenue Service raided the various nightclubs on the night of May 18. The agents noted violations and seized records and documents and distilled spirits, wines, beer, containers and strip stamps. As a result, the Grand Jury returned indictments against proprietors of the establishments for one or more of the following offenses, involving alleged fraud against the revenue laws:

1. Wilful failure to purchase the tax stamp required to be possessed and displayed by 26 U.S.C. §§ 5121, 6806. 26 U.S.C. § 5691(a).

2. Illegal refilling of liquor bottles. 26 U.S.C. §§ 5301(c), 5606.

3. Failure to maintain the proper records and documents required by 26 U.S.C. § 5124(a), 26 U.S.C. § 5603(a) and (b).

4. Making a false statement on a document where the matter is within the jurisdiction of the United States. 18 U.S.C. § 1001.

A number of the proprietors now move for the return of property and suppression of the evidence seized in the raids. They contend the affidavit fails to establish the requisite "probable cause" to obtain a valid warrant. Consequently, they interpret the raid as an invalid forcible entry, arguing that forcible entries without a warrant may be refused .in spite of the special status of searches designed to discover fraud against the internal revenue laws. See Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L. Ed.2d 60 (1970).

The Government argues for the warrant's validity. All of the parties agree that the resolution of the issue depends on the interpretation and implications of the following cases: Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); Colonnade Catering Corp. v. United States, *supra;* United States v. Biswell, 406 U.S. 311, 92 S. Ct. 1593, 32 L.Ed.2d 87 (1972).

It should be stated at the outset that the warrant for inspection and examination obtained by Agent Sanders occupies a special position under the Fourth Amendment in the context of the Congress' exercise of its broad power to regulate those privileged to conduct business in liquor and to prevent fraud against the federal revenue.

The Secretary of the Treasury or his delegate is authorized by statute to enter during business hours the premises of any liquor dealer (including the storage area) for the purpose of examining records, documents, and alcoholic beverages. If the business is conducted at night, a nocturnal inspection is valid.

26 U.S.C. § 5146. Moreover "any property subject to tax under the Internal Revenue Code possessed" for the purpose of evading or defeating the internal revenue laws or with design to avoid payment or defraud the United States of such internal revenue taxes may be seized pursuant to 26 U.S.C. §§ 7301, 7302.

Despite the broad search power of the Secretary of the Treasury and the recent decision in *Biswell, supra,* that firearms and liquor searches may be conducted without a warrant, it is necessary to have an overview of the pattern of the cases. While *Biswell* involved no force (the defendant allowing the agents in when showed a copy of the statute), Justice White emphasized the regulatory nature of the searches (implying the expectation by a federal licensee that under the law he may be subject to search) and the importance of unannounced, even frequent, inspections as a credible deterrent to violations of the law. Thus

. . . the legality of the search depends not on consent but on the authority of a valid statute.

We think a like result is required in the present case, which involves a similar inspection system aimed at federally licensed dealers in firearms. Federal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control of the liquor industry, but close scrutiny of this traffic is undeniably of central importance in federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders. 406 U.S., at 315, 92 S.Ct., at 1596.

I.

In the absence of *Colonnade, supra,* this opinion would now be finished since, *a fortiori,* if warrantless searches are valid, searches with a warrant cannot be questioned. But assuming that *Colonnade* is still good law in light of *Biswell,* a further problem presents itself.

*Colonnade* involved a forcible search, over the objections and resistance of the defendant, under the same statute as in the case at bar, *without a warrant.* The Supreme Court held that under 26 U.S. C. § 7342, which established a $500 fine for refusal to admit an agent to inspect liquor, a person could rely on the *fine,* a *criminal* penalty, as his only sanction, enabling him to avoid prosecution for any crimes which might be uncovered by the search.

In the case at bar, a warrant had been obtained. Defendants argue that despite the special power to search without a warrant, if a warrant is applied for, the usual probable cause standard jumps back in the picture. Otherwise they contend that the warrant would be a rubber stamp and would undercut the opportunity of the defendants to commit the lesser crime under 26 U.S.C. § 7342 by refusing entry to the agents. In other words, the warrant enables the agents to surprise the defendants and thereby effectively execute the general congressional mandate in accordance with the purpose of *Biswell,* but it limits the defendant's opportunity to choose the crime, which derives from *Colonnade.*

With this in mind, it would be justifiable simply to limit *Colonnade* to its own facts, admitting that in large degree the warrant here is simply a restatement of the statutory authority and valid as such.

But in a sense, a warrant here is more than a rubber stamp. The "synthetic warrant" argument, admittedly stronger here, was also made in the companion cases of *Camara* and *See, supra.* These cases, although involving administrative inspection programs, had significant distinguishing features. The cases dealt with housing and commercial building inspections for safety, health and fire hazards. Unlike the liquor searches, which are narrow in place and substantive scope, the *Camara* inspections involved area-wide searches of homes of private individuals, not licensees. Because of the sweep of such inspections, the court invalidated the warrantless

search. But recognizing the public interest in health and safety to be balanced with the Fourth Amendment individual rights, the court established an extremely relaxed standard of probable cause, of a different magnitude than required for the ordinary search of a dwelling for contraband. In quoting from Frank v. Maryland, 359 U.S. 360 at 383, 79 S.Ct. 804 at 817, 3 L.Ed.2d 877 (1959) with approval, it was remarked:

. . . The passage of a certain period without inspection might of itself be sufficient in a given situation to justify the issuance of a warrant.

Justice White went on:

. . . it is obvious that 'probable cause' . . . must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling. Such standards, which will vary with the municipal program being enforced, may be based upon the passage of time, the nature of the building, . . . or the condition of the entire area, but they will not necessarily depend upon specific knowledge of the condition of the particular dwelling. . . . The warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. 387 U.S., at 538, 539, 87 S.Ct., at 1735, 1736.

More importantly, there is purpose to the warrant in the procedure itself,

Under the present system, when the inspector demands entry, the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization. 387 U.S., at 532, 87 S.Ct., at 1732.

These remarks are relevant, though less forceful here for the very reasons

that the Government is given greater leeway:

1. The statutory standard is specific and narrow. It authorizes inspection of any liquor dealer during business hours and limits the inspection to records, documents and alcoholic beverages.

2. The licensee is not a naive homeowner, but a federally regulated dealer who has some sophistication with respect to the law.

Even so, the warrant procedure reinforces the rule of law and indicates both to the agent and the owner of the premises the nature of the authority and the scope of the search. This "formality," this "synthetic warrant" is a symbolic restatement of the limited nature of the power.

 When *Biswell* legitimated the warrantless search for firearms and liquor, it became definite that the relaxed standard of *Camara* and *See* must be relaxed specially for the federal licensing system. Here, in fact, are the cases where "the passage of a certain period of time without inspection might of itself be sufficient to justify the issuance of a warrant." In reality, 26 U.S.C. § 5146 authorizes inspection *anytime* during business hours. If the slightly stricter standard of *Camara* were applied, however, it would be satisfied. Paragraph 7 of the application for the warrant states that no inspection of the premises had been made in the last twelve months. Thus, the defendants cannot complain that they have been the subject of continuous unreasonable harassment. Except for one gun, which will be dealt with below, the objects seized were within the scope of the authorized substantive search.

█ The warrant creates a significant departure for this case from *Colonnade,* even allowing for the liberality with which the warrant may be granted. The public interest in regulating the liquor laws and discovering and preventing fraud justify such reasonable intrusions upon the business premises of fed-erally licensed liquor dealers who serve the public.

█ Defendants argue that as in *Camara* the authorities should have attempted to search without a warrant and been refused before applying for a warrant, i. e. there was no emergency. This misconceives the import of *Colonnade* and *Biswell*. *Camara* was limited to housing, health and safety inspections and stopped short of the federal licensing programs. If a *Camara* inspection without warrant were first refused, no harm would ensue. Perhaps the proprietor of the dwelling would repair the defect. But under the licensing laws, such a preliminary attempt to search would simply allow the perpetrator of a crime time to cover his tracks, defeating the purpose of the statute. Thus, Justice White repeated the distinction in *Biswell* and asserted the importance of the unannounced inspection.

## II.

The preceding discussion has taken for granted that *Colonnade* remains good law. An alternative approach to this case might question this. Given Justice White's remarks in *Biswell* on the necessity for unannounced, even frequent, inspections, and the dependence of the validity of the search not on consent but on the statutory authority, it is unavoidable to notice that *Colonnade* runs contrary to the purposes of effective statutory searches. Justice Blackmun's concurring opinion is illustrative:

Had I been a member of the Court when Colonnade Catering Corp. v. U. S., 397 U.S. 72 [90 S.Ct. 774, 25 L. Ed.2d 60] (1970) was decided, I would have joined the respective dissenting opinions of Mr. Justice Black and of The Chief Justice, 397 U.S., at 79 and 77 [90 S.Ct. at 778 and 777]. I therefore concur in the result here. 406 U.S., at 317, 92 S.Ct., at 1597.

The force of *Colonnade* is clearly weakened, and to that extent any argument relying on it is affected. A case can be made, implied by Justice Black-

mun, that *Colonnade* should be overruled for the reasons stated by Justice Black and the Chief Justice in their dissents. As Justice Frankfurter has observed,

"The rule of *stare decisis*, though one tending to consistency and uniformity of decision, is not inflexible." [citations omitted] It is true, of course, that the reason for the rule is more compelling in cases involving inferior law, law capable of change by Congress, than in constitutional cases, where this Court . . . nevertheless bears the ultimate obligation for the development of the law as institutions develop. . . . But the Court has not always declined to reexamine cases whose outcome Congress might have changed. . . . Decisions involving statutory construction, even decisions which Congress has persuasively declined to overrule, have been overruled here. Monroe v. Pape, 365 U.S. 167, at 221, 81 S.Ct. 473, at 502, 5 L.Ed.2d 492 (1961) (dissenting opinion.)

With the increasing recognition in this fast-moving world of the importance of effective law enforcement subject to the reasonableness in operation and scope commanded by the Fourth Amendment, it is appropriate to reconsider *Colonnade* and so authorize periodic, but limited in scope, liquor inspections to which a $50.00 fine for refusal is not the exclusive sanction.

If the reasons given in Part I of this opinion do not suffice, the decision could rest on the limited effect given *Colonnade* in *Biswell*, if not its overruling. Moreover, the effect of *Biswell* is to reinforce the argument that *Colonnade* must at best be restricted to its precise facts.

### III.

A special problem exists with respect to defendant Leonard J. Ciaccio in Criminal No. 72–0307. In the course of the investigation, the agents discovered a silencer. As a result, the Grand Jury returned indictments for possession of an unregistered firearm 26 U.S.C. §§ 5861(d), 5871 and possession of a firearm without a serial number 26 U.S.C. §§ 5861(i), 5871.

The Government avers that the silencer was found in a paper bag in the storage area, which would be a proper place to search. 26 U.S.C. § 5146(a). Defendant has not argued otherwise, but does declare that the seizure was illegal since not within the scope of the investigation and examination warrant. Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927).

It is established, however, that agents searching pursuant to a valid warrant who inadvertently discover what they have reason to think is contraband may seize such material although beyond the scope of the warrant. See Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). That the serial number was absent would be obvious reason for the agents of the Alcohol, Tobacco and Firearms Division to think the silencer was contraband. Moreover, independently, it has been held that a law enforcement officer who finds a firearm which he suspects is unregistered may seize it in order to check for registration. This effectuates the practical enforcement of the law. United States v. Cecil, 457 F.2d 1178 (8th Cir. 1972). On either ground, the seizure is proper. See also Anglin v. Director, Patuxent Institution, 439 F.2d 1342 (4th Cir. 1971).

The exception described in *Coolidge* distinguishes the valid seizure of material found during the proper execution of a valid warrant from a lawless general search in defiance of the narrow purpose demanded by a particular warrant. Here, the statutory warrant authorizes a search of the storage area.

### IV.

Considerable time has been spent by defendants on an evaluation of the affidavit under the *usual* probable cause standard of criminal searches. Although this standard is irrelevant, if it were proper here, it would be satisfied

by those warrants involving dealers who had not purchased stamps as shown in Paragraph 1 of the application. For example, in the warrant in Criminal No. 72–0307, United States v. Ciaccio, Inspector Sanders grounded his application on the probable cause to believe that liquor was sold at 1 N. Gay Street without the required Retail Liquor Dealer's Special Tax Stamp. 26 U.S.C. § 5121. Wilful violation of this law is a crime. 26 U.S.C. § 5691.

The application is detailed and specific, requesting authorization for a search of materials covered by the statute. Inspector Sanders, the affiant, personally directed a Special Investigator or Investigators who observed the sale of and purchased distilled spirits at 1 N. Gay Street, also known as The Talk of the Town. Defendant does not claim he was not in the business of selling liquor, and the observations of the special investigator furnish hearsay sufficiently reliable for the warrant. United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L. Ed.2d 684 (1965).

Rather, the argument focuses on Paragraph 1 of the application, stating that Sanders had caused an examination of Treasury records, which failed to reveal the issuance of the required stamp. Defendant emphasizes the fact that Sanders did not state when this examination was made, raising the possibility of remoteness in time fatal to the affidavit.

A common sense reading of the affidavit, in accordance with *Ventresca,* however, demands that Paragraph 1 be read together with Paragraph 2. There, Sanders declares that the Investigator's observations took place *within the last two days* of May, 1971. This raises the very plausible inference that Sanders' direction for the observation of The Talk of the Town followed upon the discovery of the possible tax violation. The tax violation was alleged for the year July 1, 1970 to June 30, 1971, further implying the investigation would be made late in the fiscal year. In any event, Paragraph 2 provides a temporal point of reference for the entire investigation, focusing on the crucial presence of the distilled spirits.

Defendant's contention that Paragraph 7 (noting that no examination of the dealer had been made within the past twelve months) proves the remoteness in time, confuses the examination of the dealer with the examination of the Treasury records referred to in Paragraph 1. The two are simply different.

Defendant's reliance on Rosencranz v. United States, 356 F.2d 310 (1st Cir. 1966) is misplaced. *Rosencranz* also concerned an alleged stamp violation since defendant was alleged to be distilling without the required stamp, also under 26 U.S.C. § 5691. Judge Coffin emphasized that the *averment* of time is no longer an absolute in the light of *Ventresca, supra,* if a common sense reading reasonably implies proximity in time.

Although a thorough consideration of the affidavit, its underlying facts and circumstances, failed to show such a reasonable implication, the facts were very different from the case at bar in that there was *no* mention of time in the affidavit. The argument focused on the lack of mention of time when the affiant received hearsay information that a still was present on defendant's property, with the necessity for the magistrate to make an inference upon an inference: first, that the hearsay information was received recently, and secondly, that the giver of the information was relating recently acquired knowledge.

In *Rosencranz* there was no mention of the inspection of Treasury records for the lack of a stamp. One possible interpretation is that the court had no need to discuss it. Another would be that the stamp aspect, involving a clerical search of records, is incidental or tied to the primary activity in the crime, distillation. In other words, it makes no sense to investigate for liquor months or a year after the discovery that no stamp exists. One looks first for the person

selling or distilling alcohol secretly or illegally and then inquires into the Treasury records to confirm the suspicion. This done, the application for a search warrant follows. The coordinate or subsequent observation of the premises serves to satisfy the time standard of the affidavit, but Mr. Sanders undoubtedly knew, and it was common knowledge, that the Talk of the Town was selling liquor.

This common sense explanation of the investigation is a sensible interpretation of the combined meaning of Paragraphs 1 and 2 of the affidavit, providing a proximate time focus for the affidavit, sufficient to meet the evolving constitutional standard suggested by *Ventresca*. Thus *Rosencranz* is distinguishable and only served to highlight the validity of the warrant here.