**UNITED STATES of America,
Plaintiff,**

v.

**Lester J. TRNKA, Defendant.**

**Crim. No. C3–74–75.**

United States District Court,
D. North Dakota,
Southeastern Division.

Nov. 26, 1974.

Harold O. Bullis, U. S. Atty., Fargo, N. D., for plaintiff.

Garry A. Pearson, Grand Forks, N. D., for defendant.

## MEMORANDUM AND ORDER

BENSON, Chief Judge.

Defendant, Lester J. Trnka, an attorney, is charged with knowingly failing to make an income tax return, in violation of 26 U.S.C. § 7203. Trnka has

moved this Court to suppress all evidence obtained by agents of the Internal Revenue Service during the period from November 29, 1972, to April 16, 1973.

Taking the facts as Defendant presents them, which are not disputed by the United States, the Internal Revenue Service Collection Division, on August 21, 1972, advised the Intelligence Division that Trnka had not filed his 1970 and 1971 returns. After review by the Intelligence Division, the matter was submitted to the Audit Division for continuing investigation. Trnka was contacted on November 29, 1972, by Orville Swanstrom, an agent for the Audit Division, who informed Defendant that he was seeking information about Trnka's 1969 tax return and asked Trnka to produce copies of his 1970 and 1971 returns. Swanstrom presumably knew that Trnka had not filed his tax returns for 1970 and 1971.

During Swanstrom's examination, Trnka gave him all his records for 1970 and 1971. This information, according to Defendant, "supplied the Government with sufficient information to determine Trnka's gross income, a necessary and perhaps crucial factor in establishing a failure to file a [return]". Defendant seeks to suppress Trnka's books and records and any other evidence which produced information necessary to establish gross income, together with any information derived or obtainable from those records.

From November 29, 1972, to February 14, 1973, Swanstrom conducted his examination based in part, or in whole, upon material furnished by Trnka. On February 14, the case was referred to the Intelligence Division by Swanstrom. On April 16, 1973, Trnka was first contacted by a Special Agent of the Intelligence Division.

### FAILURE TO GIVE MIRANDA WARNING

Defendant bases his Motion to Suppress on the fact that no *Miranda*[1] warnings were given Trnka from November 29, 1972, to April 16, 1973, the period between the initial contact of the Audit Division and the first contact of a Special Agent of the Intelligence Division. It is asserted that at the time the matter was turned over to Swanstrom, the case had reached the accusatory stage. Therefore, it is contended, Defendant, at his initial contact with Swanstrom, should have been advised of his right to remain silent, as to his rights concerning counsel, and of the nature of the charge against him.

■ In connection with this argument, Trnka points to an alleged IRS policy concerning voluntary disclosures of tax law violations by taxpayers which is stated to bear on the requirement that *Miranda* warnings be given at the accusatory stage. The following sentence, abstracted from a document entitled "Summary of Meeting of Commissioner's Advisory Group Held in Washington, D. C. on October 22 & 23, 1974", at p. 9, is set forth to exemplify that policy. "However it was also acknowledged by the Service that if a true voluntary disclosure was made, no criminal prosecution, nor even any criminal investigation would be instituted." Defendant states that, "even a sophisticated tax attorney who knows that when a tax investigation reaches the accusatory stage, he is entitled to a *Miranda* type warning, will be influenced, to his detriment, by the absence of such a warning, for then he is perhaps 'whipsawed' by the Government's own 'voluntary disclosure' rules. That is, if he volunteers notice of an infraction, he will seldom, if ever, be prosecuted." After reading applicable case law, this Court cannot find any connection between an IRS policy not to prosecute in such cases, or between what a taxpayer may believe to be the IRS policy concerning "voluntary disclosure", and the fact that an agent from the Audit Division did not give Defendant a *Miranda* type warning during his investigation.

■ The Eighth Circuit, in an opinion by Judge Heaney, has held squarely

---

1. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

that a taxpayer who is not in custody need not be apprised by Internal Revenue Service Agents of rights under the Fifth Amendment as enunciated in *Miranda,* or rights under the Sixth Amendment, as enunciated in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), Cohen v. United States, 405 F.2d 34 (8th Cir. 1968). Under the Eighth Circuit's decision, whether the investigation has reached the accusatorial stage, or whether it is a Special Agent or Revenue Agent[2] who is conducting a noncustodial interrogation is unconsequential. *Cohen,* in minimizing the effect of the government's accusatorial investigation emphasized the following:

> " 'The Fifth Amendment privilege prohibits the government from *compelling* a person to incriminate himself. It was the compulsive aspect of custodial interrogation, *and not the strength or extent of the government's suspicions at the time the questioning was conducted,* which led the court to impose the *Miranda* requirements with regard to custodial questioning.' " at 39, quoting from United States v. Squeri, 398 F.2d 785, 790 (2nd Cir. 1968) (emphasis added in part).

In United States v. MacLeod, 436 F.2d 947 (8th Cir. 1971), Judge Bright made it clear that "Miranda is inapplicable to noncustodial interrogations" by I.R.S. agents. *See also* United States v. Bolden, 461 F.2d 998 (8th Cir. 1972).

## WAS TAXPAYER AFFIRMATIVELY MISLED BY SWANSTROM

■ However, *Cohen* "also reemphasize[d] the views that . . . dis-

closures to Internal Revenue Service Agents, Revenue or Special, must be entirely voluntary and must not be induced by coercion, fraud, or misrepresentations." 405 F.2d at 40. Trnka's position in this respect can be stated as follows: that his understanding of the IRS policy concerning voluntary disclosures, coupled with Agent Swanstrom's so called "ruse" in his initial contact wherein he stated he was seeking information concerning Trnka's 1969 tax return, Swanstrom's concealment of his knowledge of Trnka's failure to file in 1970 and 1971, and the fact that he did not inform him of his rights and the criminal consequences that were possible, misled him into believing that he would not be prosecuted if he voluntarily cooperated. The test as to whether a taxpayer's misimpression will require suppression of evidence was set forth in *Cohen* as follows:

> "[A]gents must not *affirmatively mislead* a taxpayer into believing that the investigation is exclusively civil in character and will not lead to criminal charges." 405 F.2d at 36. (emphasis added).

Under the allegations underlying Defendant's motion, did Agent Swanstrom affirmatively mislead Trnka? United States v. Robson, 477 F.2d 13 (9th Cir. 1973), has expanded upon what constitutes an affirmative misleading of a taxpayer.

> "However, the IRS agent must not affirmatively mislead the taxpayer into believing that the investigation is exclusively civil in nature and will not lead to criminal charges. Cohen v. United States, *supra.* The record undisputedly disclosed that Agent

2. The following footnote from *Cohen,* at 35, presents a description of I.R.S. procedure and the relationship between Special and Revenue Agents.

"Revenue Agents undertake routine civil audits in an attempt to ascertain if, in fact, there has been a deficiency. The Revenue Agent, in the normal course, is not searching for evidence of fraud. If, however, the Revenue Agent discovers the possible existence of fraud, the matter is turned over to his superiors who refer the case to the Intelligence Division. The Intelligence Division then determines whether a fraud investigation is warranted. If a decision is made to commence a fraud investigation, a Special Agent is placed in charge. The Special Agent is a trained criminal investigator. His duty is to determine whether the taxpayer has, in fact, committed fraud. Both the Special Agent and Revenue Agent have virtually unreviewable discretion to dismiss the criminal aspects of a case while they are in charge." (Citations omitted)

Koba did not represent his audit to be simply 'civil' in nature. In fact, Agent Koba did not indicate to Robson that he intended to conduct a 'civil' audit; rather, he told Robson that his tax returns 'have been assigned to me for examination.' We therefore find that Agent Koba made no affirmatively misleading statements concerning the potential consequences of his audit.

Respondent would have us hold, however, that Koba's silence as to the criminal potential of his audit was an affirmative misrepresentation of the true nature of the audit. As the Fifth Circuit recently stated in United States v. Pruden, *supra,* 424 F.2d at 1032:

'Silence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading.'

None of these factors was present here. As noted above, Agent Koba was under no duty to mention the possible criminal consequences of his audit, and the record discloses no intimation that Koba was ever queried as to the scope of his investigation." at 18.

There is no fact alleged which would show that Swanstrom *affirmatively* misled him into believing that he would not be prosecuted. If anything, it was Defendant's belief gained through experience as a tax attorney, that were he to cooperate the I.R.S. would not prosecute. This subjective factor does not meet the test. The alleged "ruse" of Agent Swanstrom cannot be characterized as an affirmatively misleading statement concerning the potential consequences of his audit. And silence as to the criminal potential of the audit and his knowledge concerning the potential criminal consequences and Trnka's failure to file does not constitute an affirmative misstatement under the *Robson* rationale with which this Court agrees.

■ A further point to be discussed is the effect of the IRS policy to which Defendant has alluded. It arguably follows that, if an individual agent cannot affirmatively mislead a taxpayer into believing he will not be prosecuted as a result of an investigation, the IRS could not do so as an agency by an affirmative communication that those who cooperate will not be prosecuted. Again, Defendant has failed to allege that he was affirmatively misled by a communication or IRS agent concerning prosecution in failure-to-file cases. His reliance is based upon his experience as a tax attorney that the IRS will "seldom, if ever" prosecute where one voluntarily cooperates. A taxpayer's subjective belief does not meet the test, and Defendant has not alluded to any express communication, oral or written, by the IRS upon which he relied in deciding to cooperate with the investigation by Swanstrom.

In fact, Defendant has searched for documentation to support his belief, and that which he has presented to the Court does not support his position that such a policy exists, as he understands it, as is evidenced by an examination of the entire comment within the Summary presented by Defendant.

"A. Members of the Advisory Group requested the current thinking of the Internal Revenue Service with reference to voluntary disclosure of a criminal violation of the tax laws. It was noted that the official position of the Internal Revenue Service was now to the effect that a voluntary disclosure would not save the taxpayer from criminal prosecution. However, it was also acknowledged by the Service that if a true voluntary disclosure was made, no criminal prosecution, nor even any criminal investigation, would be instituted. The Service desires to continue under that program because of the difficulty in defining voluntary disclosure. The Chief Counsel's office has recently concluded a study of the voluntary disclosure policy and decided not to change the official policy."

This statement, while somewhat unclear, indicates that the chances of prosecution in the cases of voluntary disclosure are greatly minimized. It does not lead to

the inescapable conclusion that those who voluntarily disclose a violation of tax laws will never be prosecuted. To repeat, it is not claimed that an affirmative communication was received by Trnka prior to the investigation of his failure to file, or during his investigation, setting forth a policy in practice that those who voluntarily cooperate will not be prosecuted. There is no need for an evidentiary hearing to determine what the policy of the IRS is on this point. Trnka's claimed belief that he would not be prosecuted is based upon his experience with others who have failed to file. Again, this subjective understanding is not tantamount to an affirmative misrepresentation.

## THE "NEWS RELEASE" APPROACH

Defendant states the main thrust of his argument is founded upon I.R.S. News Release, No. 897, October 3, 1967.[3] The News Release requires Special Agents of the Intelligence Division in investigating suspected tax fraud to notify the taxpayer on initial contact that he is investigating the possibility of criminal tax fraud, and after preliminary inquiries, to give the taxpayer his *Miranda* warnings. Basing his argument on two appellate decisions, United States v. Heffner, 420 F.2d 809 (4th Cir. 1970), and United States v. Leahey, 434 F.2d 7 (1st Cir. 1970), it is urged that a Gov-

ernment agency must scrupulously observe rules on procedure which it has established and when it fails to do so its action cannot stand and courts will strike it down. Following this proposition, *Heffner* reversed a conviction for tax fraud where, at trial, an I.R.S. Special Agent was permitted to testify concerning the defendant's incriminating statements at an interview where News Release 897 was not observed, and the defendant was not given the requisite warning. In *Leahey*, the suppression of evidence was upheld where New Release 897 did not receive compliance. There are two obstacles to the application of the "News Release Approach" to this case.

First, the Eighth Circuit has not been influenced in its decisions by News Release 897, or similar releases. *Cohen; United States v. MacLeod*, 436 F.2d 947 (8th Cir. 1971). In *Cohen*, the Eighth Circuit rejected an argument that the failure to follow announced procedure concerning warnings to taxpayers by Special Agents would require suppression of evidence gathered during interviews where such procedural announcements did not receive compliance. In considering a News Release which went further than News Release 897 in its directive to Special Agents, and which apparently replaced News Release 897,[4] the Eighth Circuit was not influenced.

---

3. "'In response to a number of inquiries, the Internal Revenue Service today described its procedure for protecting the Constitutional rights of persons suspected of criminal tax fraud, during all phases of its investigations.

   'Investigation of suspected criminal tax fraud is conducted by Special Agents of the IRS Intelligence Division. This function differs from the work of Revenue Agents and Tax Technicians who examine returns to determine to correct tax liability.

   'Instructions issued to IRS Special Agents go beyond most legal requirements to assure that persons are advised of their Constitutional rights.

   'On initial contact with a taxpayer, IRS Special Agents are instructed to produce their credentials and state: "As a special agent, I have the function of investigating the possibility of criminal tax fraud."

'If the potential criminal aspects of the matter are not resolved by preliminary inquiries and further investigation becomes necessary, the Special Agent is required to advise the taxpayer of his Constitutional rights to remain silent and to retain counsel.

'IRS said although many Special Agents had in their past advised persons not in custody, of their privilege to remain silent and retain counsel, the recently adopted procedures insure uniformity in protecting the Constitutional rights of all persons.'" as quoted from Defendant's brief.

4. "'* * * At the initial meeting with a taxpayer, a Special Agent is now required to identify himself, describe his function, and advise the taxpayer that anything he says may be used against him. The Special Agent will also tell the taxpayer that he cannot be compelled to incriminate himself

"The administration of the new Internal Revenue Service procedure will raise practical problems. In some instances, the Revenue Agents will have obtained the evidence necessary to obtain a conviction before referral; in others, Revenue Agents might be encouraged to expand their inquiries. Furthermore, a determination as to when the right to warnings attach should not depend on the title and function of the official investigator."

"To meet these problems, Law Review commentary recommends that warnings be optional with the Internal Revenue Service depending on whether there is a desire to preserve the right to use any evidence obtained in a criminal prosecution. If it had this desire, full warnings would be required."

"If a taxpayer is entitled to be warned of his Fifth and Sixth Amendment rights in a noncustodial tax investigation, the Law Review recommendations would be meritorious. While the suggested procedure would impose additional administrative tasks, it would be fair to the taxpayer and susceptible of review. We do not require it, however, because we do not believe that the taxpayer is so entitled. *Cohen,* 405 F.2d at 39, 40 (Citations omitted).

▇ Secondly, there is no allegation which would support the contention that the I.R.S. failed to comply with News Release 897. While the stated purpose of the procedure is to protect "the Constitutional rights of persons suspected of criminal tax fraud, *during all phases of its investigations*", the latter phrase cannot be read to apply to I.R.S. Agents generally. The directive is clearly limited to investigations by the Intelligence Division, and it is also clear that the IRS does not consider one to be suspected of criminal tax fraud until the Intelligence Division begins its investigation.

"Investigation of suspected criminal tax fraud is conducted by Special Agents of the IRS Intelligence Division. This function differs from the work of Revenue Agents and Tax Technicians who examine returns to determine to correct tax liability. . . ." IRS News Release, No. 897, October 3, 1967.

*Cohen, Heffner,* and *Leahey* all considered the applicability of the Release to investigations conducted by Special Agents. In this circuit, it is of no consequence when the accusatory stage is reached or when one becomes suspected of tax fraud. There is no allegation that, when the Intelligence Division conducted their investigation, the News Release directives did not receive compliance.

To summarize:

1. There is no requirement that *Miranda* warnings be given during non-custodial interrogations, including interrogation by IRS agents. It is inconsequential whether the IRS investigation reached the accusatory stage.

2. There is no claim or allegation which would support a finding

---

by answering any questions or producing any documents, and that he has the right to seek the assistance of an attorney before responding.

'Previously, the Special Agent identified himself and described his function at the first meeting with the taxpayer but was not required to give further advice unless the taxpayer was in custody or the investigation proceeded beyond the preliminary stage.

'IRS has made no change in its existing instructions that if it becomes necessary to interview a person who is in custody, an Agent must give a comprehensive statement of rights before any interrogation. This statement warns the person in custody that

he may remain silent and that anything he says may be used against him.

'A person in custody also must be told that he has the right to consult or have present his own counsel before making a statement or answering any questions, and that if he cannot afford counsel he can have one appointed by the U. S. Commissioner.'

IRS News Release IR–949, November 26, 1968." *Cohen* 405 F.2d at 39.

It is noteworthy that News Release 949 requires the warning to be given at initial contact, and not after preliminary proceedings as per 897, and that the statement of rights to be given is more comprehensive under News Release 949.

that Agent Swanstrom affirmatively misled Trnka as to the consequences of his investigations, and there is no claim to support a finding that the IRS did so.

3. The news release approach has not been adopted in the Eighth Circuit, and there is no allegation that Special Agents did not comply with IRS directives concerning *Miranda*-type warnings.

Therefore, it is ordered that Defendant's Motion for Suppression of Evidence, and his Motion for an Evidentiary Hearing are hereby denied.