**UNITED STATES of America Plaintiff**

v.

**Jorge Burgos BENEZARIO Defendant**

**No. CRIM. 03–262SEC.**

United States District Court,
D. Puerto Rico.

Oct. 8, 2004.

Lynn M. Doble–Salicrup, United States Attorney's Office, Torre Chardon, San Juan, PR, Nathan Joseph Schulte, United States Attorney's Office, Torre Chardon, PR, for USA, Plaintiff.

Joannie Plaza–Martinez, Federal Public Defender's Office, Joseph C. Laws, Federal Public Defender's Office, Hato Rey, PR, for Jorge L. Burgos–Benezario (1), Defendant.

## OPINION AND ORDER

CASELLAS, District Judge.

On September 23, 2003, government officials entered the residence inhabited by

Defendant, his wife and four minor children and, upon searching the house in its entirety, seized controlled substances, drug paraphernalia and a weapon. Subsequently, Defendant was arrested and charged by a Grand Jury on September 25, 2003 with several violations of law, to wit: 18 U.S.C. § 922(g)(1) and 924(c)(1)(A)(I), and 21 U.S.C. § 841(a)(1) and (b)(1)(c).

On June 18, 2004, the Defendant filed a Motion To Suppress, requesting that the Court suppress all evidence seized from his residence on September 23, 2003 (**Docket # 30**). The Government opposed said motion (**Docket # 33**). Both parties stated in their motions that a hearing would assist the Court to rule on the motion. Accordingly, on August 10, 2004, a suppression hearing was held. At said hearing, the Court was primarily presented with testimonial evidence of three witnesses: Agent Francisco Pérez and Agent Jose Román, both from the Drug Enforcement Administration (DEA), and Ms. Susan Ríos, a young girl who was present during the incident in controversy. Thereafter, the parties were granted leave to file memorandums of law in support of their respective positions as to the requested suppression (*See* **Dockets ## 43 & 44**).

After carefully reviewing the parties' briefs, the arguments and the evidence presented at the suppression hearing as well as, the applicable law, we find that Defendant's motion should be **GRANTED**. Therefore, all the evidence seized during the September 23, 2003 intervention shall be suppressed.

**Factual Background**

The following findings of fact are based on the evidence presented at the suppression hearing.

On September 23, 2003, DEA Agent Francisco Pérez received a telephone call from what he called a "reliable source" (Tr. at p. 6). The informant told Agent Pérez that drugs, money and weapons were being stored at an address in Rexville, Bayamón (Tr. at pp. 6, 7 and 44). However, the informant did not know the specific address (Tr. at p. 43, 44). The informant also gave a "very general" description of the owner of the house, a description of the vehicle he drove, and stated that he lived at the said residence with his wife and kids (Tr. at pp. 10, 15 and 83).

Thereafter, Agent Pérez, along with an another agent, attempted to locate the house described by the informant (Tr. at p. 8). According to Agent Pérez, he located the residence at around 5:00 to 5:30 p.m. (Tr. at p. 9). However, Agent Pérez was able to observe that the vehicle described by the informant as the vehicle driven by the owner of the house was not there (Tr. at p. 84). In addition, Agent Pérez did not witness any criminal activity in the immediate area (Tr. at p. 58). No further surveillance was conducted and the agents "were not sure who was in the residence" (Tr. at. p. 12).

Subsequently, Agent Pérez contacted and met with a group law enforcement officers at the Rexville Plaza Mall in order to formulate a plan to corroborate the information he had received (Tr. at p. 9). Upon discussing their options, the officers concluded that, in order to save time, they would attempt to obtain consent to search the premises rather than to go through the process of requesting a search warrant (Tr. at p. 9). As part of their plan, they agreed to use a ruse to obtain consent by telling Defendant that they were U.S. Marshals looking for a fugitive (Tr. at p. 14). Agent Pérez stated that he had sufficient information to obtain a search warrant (Tr. at pp. 35, 45). This is what he should have done.

Later on, at around 6:30 to 6:45 p.m., approximately six (6) DEA agents and two (2) P.R. Police officers, all dressed in civilian clothing, went to Defendant's residence (Tr. at p. 9, 10, 16). DEA Agent José Román called on the door and a little girl came to the door (Tr. at p. 14, 112, 114). He told the little girl that they were the police and that if her father did not show up at the door they were going to arrest him (Tr. at pp. 113, 114). Subsequently, Defendant came to the door and Agent Román told him that they were U.S. Marshals looking for a fugitive (Tr. at p. 114). Agent Román proceeded to show Defendant a badge (Tr. at p. 114). The badge that was shown was not from the U.S. Marshals but from the DEA (Tr. at p. 114, 115).

The events that occurred after this point are in controversy. According, to Agent Román, he told Defendant that they wanted to search the house to check if a fugitive was hiding inside (Tr. at p. 115). In addition, Agent Román states that Defendant told him that there was no fugitive in the house and that they could check whatever they wanted (Tr. at p. 115, 133). No other agent heard the alleged consent given by Defendant (Tr. At p. 68). However, according to the testimony of Ms. Ríos, what Agent Román stated was that all that they wanted to do was to check the carport and backyard area (Tr. at p. 173). Ms. Ríos stated that Defendant agreed to said request and proceeded to tell Agent Román to follow him and that he would show him the driveway and the yard (Tr. at p. 175).

Immediately thereafter, Agent Román entered the house following Defendant (Tr. at pp. 115, 175). According to Agent Román, he along with Agent Pérez and two other officers, entered the house and proceeded to do a quick "security sweep" (Tr. at p. 115). At this time, the agents' guns were unholstered (Tr. at p. 125). Agent Pérez testified that they were trying to keep their actions as if they were in fact looking for a fugitive (Tr. at p. 17). However, in her testimony, Ms. Ríos states that when the officers entered the house, they started to search all over, including the kitchen cabinets, the pots, the china cabinet, the flower pots, the fish tank, in the bedrooms and the closets (Tr. at p. 176).

According to the Agents' testimony, there was nothing illegal at plain view and no illegal material or threat was found after the first search or "security sweep" was conducted (Tr. at pp. 74, 79, 121, 141). Therefore, the agents holstered their weapons and proceeded to regroup (Tr. at p. 126). Thereafter, Agent Román returned to the master bedroom, opened the closet door and removed a black bag from that area (Tr. at p. 126). **There is no evidence in the record indicating that Defendant was asked for consent to conduct this second search of the bedroom** (Tr. at p. 140).

Subsequently, Agent Román asked Defendant if he could open the black bag (Tr. at p. 142). It was at this time that the agents perceived that Defendant had realized that they were not looking for a fugitive (Tr. at p. 28). According to Agent Pérez, he never heard Defendant say that he did not want the bag to be opened (Tr. at p. 21). In addition, the testimony of the agents reflects that Defendant was concerned over the opening of the black bag in the presence of the children. However, again the testimony of Ms. Ríos contradicts the statements made by the agents regarding the opening of the black bag. Ms. Ríos stated that while she was at the master bedroom, she saw one of the agents come in and open the closet door (Tr. at p. 178). This agent was accompanied by Defendant (Tr. at p. 178). At that time the

agent grabbed a black bag (Tr. at p. 180). According to Ms. Ríos, Defendant repeatedly asked the agent whether he was going to open the bag, to which the agent replied "yes" (Tr. at p. 180). Ms. Ríos testified that she never heard Defendant consent to the search of the bag (Tr. at p. 181).

As result of the search, illegal materials were found inside the bag (Tr. at 29). The same were immediately seized. Subsequently, Defendant was advised of his Miranda rights. In addition, Agent Pérez told Defendant that, because they had found illegal material, they had the right to continue searching the house. Defendant admitted ownership of the illegal materials and proceeded to show the agents another hidden place that contained more illegal materials. Afterwards, Defendant was placed under arrest and taken away by the agents. Thereafter, a written consent form was given and signed by Defendant at the HIDTA Office after the residence had been searched and after he had been arrested.

**Applicable Law and Analysis**

Although there are several factual areas in dispute, as to the direct issue of the warrantless search, there are only two contested facts: (1) whether Defendant consented to the first search of the house in its entirety as the Government proposes or, as he proposes, he only consented to **one** search of the backyard and carport of the house; and (2) whether Defendant consented to the search of the backpack found in the master bedroom's closet. There are other contested facts, however, said factual determinations are not necessary since the admissibility of all evidence depends upon the Court's determination of the legality of the first and second search. If either the first or the second search of the house is deemed unlawful, the search of the backpack would be a product of an unlawful

search inasmuch as the agents had no right to be in a position to find the backpack in the first place.

■ The Fourth Amendment commands that searches and seizures be reasonable. What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *U.S. v. Montoya Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). The warrant and probable cause requirements of the Fourth Amendment are not absolutes that must be complied with in each set of facts. The permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. *Id.* (citing *U.S. v. Villamonte Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983); *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)).

■ The Supreme Court has held that, unlike those rights which are guaranteed to a criminal defendant to ensure a fair trial, the Fourth Amendment protects interests which are "of a wholly different order and have nothing whatever to do with promoting the fair ascertainment of truth at a criminal trial." *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The Fourth Amendment's prohibition against unreasonable searches and seizures forbids most warrantless searches. Warrantless searches are presumptively illegal. *See Katz v. U.S.*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (stating that warrantless searches are *"per se* unreasonable under the Fourth Amendment subject

only to a few specifically established and well-delineated exceptions"). The only exception which allows a full search for an investigative purpose without a search warrant or probable cause is in cases of authorized and voluntary consent. *See Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Once it is established that a warrantless search occurred, the burden is on the government to establish, by a preponderance of evidence, that their conduct was within one of the recognized exceptions and was reasonable. *U.S. v. Whitten*, 706 F.2d 1000 (9th Cir. 1983).

■■■ An application of this exception first involves an analysis of whether the consent was voluntary given and, if so, an examination on whether the execution and scope of the search conformed with the precise limits of the exception as it has been judicially defined. *U.S. v. Maldonado Garcia*, 655 F.Supp. 1363, 1366 (D.P.R. 1987); *see also U.S. v. Montoya*, 760 F.Supp. 37, 39–40 (E.D.N.Y.1991)(*citing Maldonado Garcia*, 655 F.Supp. 1363). In order to find consent, the district court must observe from the totality of the circumstances that (1) the consent was voluntary, and (2) that the search did not exceed the scope of the consent. *U.S. v. Price*, 925 F.2d 1268, 1270 (10th Cir.1991); *see also Maldonado Garcia*, 655 F.Supp. at 1366; *Schneckloth*, 412 U.S. at 233, 93 S.Ct. 2041. A search conducted pursuant to consent may not exceed the scope of the consent sought and given. *Florida v. Jimeno*, 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *U.S. v. Donlin*, 982 F.2d 31 (1st Cir.1992); *U.S. v. Luna–Rojas*, 28 F.Supp.2d 54 (D.P.R.1998). In addition, one of the factors to take into consideration when analyzing the totality of the circumstances is whether the government agents gained entry by ruse or de-

ception. *Maldonado Garcia*, 655 F.Supp. at 1366.

Although some courts have found nothing wrong with the use of ruses and have stated that "consent is not necessarily violated by deception and subterfuge on the part of the police," other courts have condemned said strategy holding that "when a government agent uses deceit, trickery, or misrepresentation to secure consent to search, said consent has been held to be involuntary." *U.S. v. Andrews*, 746 F.2d 247 (5th Cir.1984); *U.S. v. Scherer*, 673 F.2d 176, 181–82 (7th Cir.1982)(agent posing as cousin of an informant invited on property to build duck blinds); *U.S. v. Wright*, 641 F.2d 602 (8th Cir.1981)(officers pretending to have car trouble and asking for tools and a flashlight see drugs inside when door opened); *U.S. v. Raines*, 536 F.2d 796, 799–800 (8th Cir.1976)(agent falsely represented himself as a mutual friend of occupant's drug associate and stated truthfully that the associate had been arrested); *U.S. v. Tweel*, 550 F.2d 297 (5th Cir.1977); *U.S. v. Robson*, 477 F.2d 13 (9th Cir.1973); *U.S. v. Bosse*, 898 F.2d 113, 115 (9th Cir.1990)(federal agent posed as assisting a state licensing inspector); *U.S. v. Giraldo*, 743 F.Supp. 152, 154 (E.D.N.Y.1990)(officers gained entry by falsely stating that a possible gas leak was a threat to the safety of the occupants).

On a previous occasion this District Court addressed the issue regarding the use of a ruse or deception to obtain consent. In *Maldonado Garcia, supra*, government agents obtained access to an apartment by falsely stating to the defendant that he had to open the door because they had a summons for him. In *Maldonado Garcia* the Court stated that:

[O]fficers cannot use a ruse to gain access unless they have more than mere conjecture that criminal activity is underway. To hold otherwise would be to

give police a blanket license to enter homes randomly in the hope of uncovering incriminating evidence and information. That this last was the intention of the police in this case is evident from the testimony of Postal Inspector Pacheco who admitted that he did not know if there was any evidence in the apartment, that he was acting solely on an anonymous tip, that he did not have probable cause and that his motivation was to fish for incriminating evidence. *Maldonado Garcia*, 655 F.Supp. at 1366.

In addition the *Maldonado Garcia* Court also commented that:

> [S]imply because police regularly use subterfuge to gain access to putative defendants and that courts have generally condoned this conduct does not mean that the same can be carried out with impunity. *See Hoffa v. U.S.*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374(1966) (The Fourth Amendment can be violated by guileful as well as by forcible intrusions into a constitutionally protected area); *Lee v. U.S.*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270(1952) (an unlawful seizure may violate the Fourth Amendment although the entry upon the premises was by subterfuge or fraud rather than force.).

*Maldonado Garcia*, 655 F.Supp. at 1367.

■ An otherwise valid consent may not be sufficient to render a search constitutional if it follows from prior government misconduct. In such circumstances, the unlawful conduct "taints" the later-given consent. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *U.S. v. Lopez–Arias*, 344 F.3d 623, 629 (6th Cir.2003) (unlawful seizure taints later consent); *U.S. v. Buchanan*, 904 F.2d 349, 355 (6th Cir.1990) (unlawful presence on property taints later consent). Where consent follows a prior unlawful act by the government, that con-

sent is tainted, and cannot on its own justify a search. The Government must show more than mere voluntariness. *See Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). To overcome this taint, the Government must prove an "intervening act of significance between the time of the illegal [presence] and the time" the consent form is signed. *Buchanan*, 904 F.2d at 356 (6th Cir.1990).

■ In the above-captioned case, DEA Agents pretending to be U.S. Marshals, supposedly looking for a fugitive, searched Defendant's house. There is no dispute that the Government gained entry to Defendant's house by ruse or deception. It is Defendant's position that he consented to having his backyard/ carport area searched for a fugitive. The evidence presented at the hearing points to a consent of limited nature and for a limited purpose (i.e. to search for a fugitive). The record indicates that, upon searching the house and not finding anything illegal (i.e. the supposed fugitive), the agents again started to search, this time without even asking for consent. It is the agents' testimony that they were trying to keep their actions as if they were in fact looking for a fugitive. However, the evidence presented indicates that the agents searched in areas were no fugitive could possibly be hiding.

■ Even assuming *in arguendo* that Defendant consented to the search of his entire house, then only the first search was lawful and valid. Accordingly, any subsequent un-consented search would be unconstitutional. After the first search, no illegal evidence was seized, therefore, the agents had no lawful purpose for staying in Defendant's house. We find that, if the agents intended to search again, they had to either get consent from Defendant, or obtain a search warrant. The continuous presence of the agents after the first

search was conducted was not justified by any exception to a warrantless search nor by exigent circumstances. Therefore, we necessarily conclude that the second search was unlawful and all evidence product of such search and subsequent searches must be suppressed. The second search as well as the majority of the first exceeded the scope of the consent obtained by the ruse (i.e. searching for a fugitive) and, hence, is unjustified and unconstitutional. Moreover, the record is devoid of any evidence indicating that consent was validly given to conduct a second search or to open the bag.

Furthermore, the evidence presented does not support a conclusion indicating that there existed exigent circumstances to support a warrantless search. Moreover, from the agents own testimony, the Court can deduct that the agents did not have probable cause to conduct a warrantless search since (1) they were not certain that the house they were going to search was in fact the one the informant had referred to, (2) they did not see at the house the vehicle the informant had described, (3) they only had a very general description of the target person, (4) they were not certain that there was any incriminating evidence in the residence, (5) they did not conduct surveillance of the area, (6) they did not observe any criminal activity or emergency condition in the vicinity and, (7) they did not know who was inside the residence. *See Ill. v. Gates,* 462 U.S. 213, 238–244, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)(Fourth Amendment does not require "standard that leaves no place for anonymous citizen informants" but there must be independent investigation and corroboration that provides "substantial basis for crediting hearsay.").

Finally, the Government's claim that a written consent form to search the residence signed by Defendant is evidence of a valid consent cannot stand since said consent form was signed after the facts and, as we previously stated, Defendant's original consent was tainted and therefore, the post written waiver cannot validate the prior search.

## Conclusion

We do not treat the offense of which Defendant is accused lightly. However, we are profoundly concerned with the agents' conduct in this case. We are particularly aware of our responsibility to guard against Fourth Amendment violations. "It is the duty of courts to be watchful of the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Schneckloth,* 412 U.S. at 229, 93 S.Ct. 2041 (quoting *Boyd v. U.S.,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886)). Therefore, for the reasons set herein, we **GRANT** Defendant's Motion to Suppress.

**SO ORDERED.**